IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| MIDLOTHIAN LABORATORIES, L.L.C., | ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 2:04cv836-MHT |
| PAMLAB, L.L.C., and PAN | ) | (WO) |
| AMERICAN LABORATORIES, | ) | |
| L.L.C., | ) | |
| | ) | |
| Defendants. | ) | |

OPINION

This lawsuit involves a dispute over a 'medical food'

and the trademark for it.

The plaintiff is Midlothian Laboratories, L.L.C., an

Alabama company that markets and distributes 'generic'

versions of prescription drugs and vitamin products.[1] The

defendants are Pamlab, L.L.C. and Pan American

Laboratories, L.L.C., Louisiana companies that market and

_____

1. Exhibit 11 to Midlothian's motion for summary
judgment on defendants' counterclaim (Doc. No. 61),
Declaration of Bryce M. Harvey, p. 1.

distribute prescription drugs and vitamin products.  Pan American Laboratories, L.L.C. is a wholly-owned subsidiary of Pamlab, L.L.C., and both defendants will be referred to as "Pamlab."[2]  Pamlab is the owner of a federal trademark registration (Reg. No. 2,547,853) for the mark FOLTX for "Folic acid / B-complex medical food supplement" in International Class 5.[3]  The court will differentiate between the mark and the product for which it stands by indicating the mark as "FOLTX" and the product as "Foltx," except where the court quotes from documents using a different orthography.

Midlothian charges Pamlab with false advertising and trademark cancellation under the U.S. Trademark Act of 1946 (the Lanham Act) and unfair competition under Alabama state law.  Count I of Midlothian's complaint alleges "improper use" and false advertising in violation

---

2.  Exhibit 13 to Midlothian's motion for summary judgment on defendants' counterclaim (Doc. No. 61), deposition of Barry D. LeBlanc, p. 11.

3.  Exhibit 2 to Pamlab's motion for summary judgment (Doc. No. 56), Declaration of Barry D. LeBlanc, p. 2.

of § 43(a)(1) of the Lanham Act, 15 U.S.C. § 1125(a)(1); count II alleges false advertising in violation of § 43(a)(1) of the Lanham Act, 15 U.S.C. § 1125(a)(1); count III alleges inducement to violate § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); count IV alleges violation and inducement to violate the common law of Alabama (tort of interference); and count VI alleges that the FOLTX mark has been abandoned, such that its registration should be cancelled pursuant to 15 U.S.C. § 1119.[4]   In response, Pamlab has filed a counterclaim alleging false advertising in violation of § 43(a)(1) of the Lanham Act, 15 U.S.C. § 1125(a)(1).

Jurisdiction over Midlothian's federal claims is proper under 15 U.S.C. § 1121 (trademark), 28 U.S.C. § 1331 (federal question), and 28 U.S.C. § 1338 (unfair competition in trademark).  Supplemental jurisdiction over Midlothian's Alabama state-law claim is proper under

---

4.  Count V in Midlothian's complaint alleges violation and inducement to violate the Florida Deceptive and Unfair Trade Practices Act.  This court will address this count in a separate order.

3

28 U.S.C. § 1367. Jurisdiction over Pamlab's counterclaim is proper under 15 U.S.C. § 1121 (trademark) and 28 U.S.C. § 1331 (federal question).

This case is before the court on Pamlab's motion for summary judgment on all of Midlothian's claims, Midlothian's motion for summary judgment on count I of its complaint, and Midlothian's motion for summary judgment on Pamlab's counterclaim. Having reviewed the extensive factual record in detail, the court concludes, for reasons given below, that summary judgment should be granted in favor of Pamlab on Midlothian's federal and Alabama state-law claims, and summary judgment should be denied on Pamlab's counterclaim.

## I. SUMMARY-JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

4

matter of law." Fed. R. Civ. P. 56(c). Under Rule 56, the party seeking summary judgment must first inform the court of the basis for the motion, and the burden then shifts to the non-moving party to demonstrate why summary judgment would not be proper. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986); <u>see also</u> <u>Fitzpatrick v. City of Atlanta</u>, 2 F.3d 1112, 1115-17 (11th Cir. 1993) (discussing burden-shifting under Rule 56). The court's role at the summary-judgment stage is not to weigh the evidence or to determine the truth of the matter, but rather to determine only whether a genuine issue exists for trial. <u>Anderson v. Liberty Lobby, Inc</u>., 477 U.S. 242, 249 (1986). In doing so, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp</u>., 475 U.S. 574, 587 (1986).

## II. BACKGROUND

When Pamlab first began marketing Foltx in October 1999, the product consisted of 1.0 mg. of vitamin B12, 25 mg. of vitamin B6, and 2.5 mg. of folic acid.[5]  Pamlab markets Foltx directly to physicians as a prescription treatment for vitamin B12 deficiency.[6]  Its marketing techniques include employing a sales team to visit physicians directly, providing product samples, publishing articles and advertisements in medical journals, and funding clinical studies.[7]

Although Foltx is marketed as a prescription product, it is not a drug.  Rather, it is classified as a 'medical food': a product prescribed by physicians to patients who have special nutrient needs in order to manage a disease or health condition.  The U.S. Food and Drug Administration (FDA) has formulated no specific requirements for the safety or appropriate use of medical

---

5.   Harvey declaration, p. 2.

6.   LeBlanc declaration, p. 2.

7.   Id.

6

foods.  "Medical foods do not have to include nutrition information on their labels, and their claims do not need to meet specific standards."  U.S. Food & Drug Admin., <u>Medical Foods</u>, http://www.cfsan.fda.gov/~dms/ds-medfd.html.

The Orphan Drug Amendments of 1988 enacted, for the first time, a statutory definition of "medical food":

> "The term 'medical food' means a food which is formulated to be consumed or administered enterally under the supervision of a physician and which is intended for the specific dietary management of a disease or condition for which distinctive nutritional requirements, based on recognized scientific principles, are established by medical evaluation."

Orphan Drug Amendments of 1988 § 5(b)(3), 21 U.S.C. § 360ee(3).  However, the legislative history of the amendments is silent as to the types of products meant to be covered.  The statutory definition was incorporated into the Federal Food, Drug and Cosmetic Act (FDCA), which exempts medical foods from the nutrition labeling, health claim, and nutrient-content-claim requirements

7

applicable to most other foods. 21 U.S.C. § 343(q)(5)(A)(iv). The paradoxical result of this exemption is that "medical foods intended for use by sick people are subject to much less scrutiny than virtually all other foods, which are intended for the healthy general population." Regulation of Medical Foods, 61 Fed. Reg. 60,661 (proposed Nov. 29, 1996) (to be codified at 21 C.F.R. ch. I).

The FDA published an advanced notice of proposed rulemaking regarding medical foods in November 1996, citing the rapid increase in the number of products marketed as medical foods and the "potential for injury to consumers and fraud as claims that are not supported by sound science proliferate for these products." Id. at 60,663. After a careful analysis of the definition of medical foods and the statutory scheme in which it was promulgated, the FDA stated that "some level of substantiation for a medical food's claimed usefulness in the dietary management of disease" is required: "The agency's preliminary view is that the scientific standard

contained in the statutory medical food definition may require some of the same type of data for medical foods as are needed to support drug claims (e.g., data from clinical investigations)." Id. at 60,670.

However, in regulations published November 26, 2004, the FDA withdrew the proposed rule, stating: "Because of competing priorities that have tied up FDA's limited resources, the agency has been unable to consider, in a timely manner, the issues raised by comments on the [proposed rule], and does not foresee having sufficient resources in the near term to do so." Withdrawal of Certain Proposed Rules and Other Proposed Actions, 69 Fed. Reg. 68,831, 68,834 (Nov. 26, 2004). Therefore, medical foods continue to occupy a regulatory loophole exempt from both the nutrition-nutrient labeling requirements applicable to most foods, as well as the labeling and testing requirements applicable to drugs.[8]

---

8.  In withdrawing the proposed rule, the FDA advises that it "will continue to refer to the basic principles described in the [proposed rule] and in FDA's Medical
(continued...)

It is in this context that Pamlab produced and marketed Foltx.

In December 2003, Midlothian brought to market its first product: a medical food consisting of the same amounts of folic acid, vitamin B12 and vitamin B6 as Foltx, and marketed as a 'generic equivalent' to Foltx.[9] In contrast to Pamlab, Midlothian does not market its product to physicians; rather, it markets to drug wholesalers and retailers such as pharmacy chains, who, according to state laws, may (and in some cases are required to) substitute a generic product when presented with prescriptions for Foltx.[10]

---

8. (...continued)
Foods Compliance Program (CP 7321.002) when evaluating medical foods." Id. It also advises that it retains enforcement jurisdiction under 21 U.S.C. § 343 over all foods (including medical foods) with false or misleading labeling, as well as over medical foods with unapproved ingredients.

9. Harvey declaration, p. 2.

10. Exhibit 5 to Pamlab's motion for summary judgment (Doc. No. 56), Deposition of Bryce Harvey, pp. 74-77.

Midlothian's advertisements claim that its product is a "generic equivalent" and is "bioequivalent" to Foltx.[11] The manufacturer of Midlothian's product, Chemins Company, Inc., performed chemical analyses on each batch of Midlothian product and produced a certificate of analysis indicating the amounts of active ingredients present in each batch.[12] Midlothian never asked for or received the certificate of analysis for any batch of its product until sometime after March 2005, over 14 months after the product appeared on the market.[13] At least one test of Midlothian's product revealed the presence of only two of the active ingredients found in Foltx.[14]

---

11. Exhibit 10 to Pamlab's response in opposition to Midlothian's motion for summary judgment on defendants' counterclaim (Doc. No. 76), Midlothian advertisement.

12. Exhibit C to Pamlab's unified supplemental response to Midlothian's motion for summary judgment on counterclaim and reply in support of defendants' motion for summary judgment (Doc. No. 82), deposition of Rhonda Yeater, p. 98.

13. Id., pp. 91-94.

14. Exhibit 10 to Exhibit D to Pamlab's unified supplemental response to Midlothian's motion for summary
(continued...)

One week after learning that Midlothian had introduced its product (by listing it on a pharmaceutical database) and that a second company, Breckenridge Pharmaceuticals, Inc., planned to list its own 'generic' version of Foltx,[15] Pamlab filed a federal patent-infringement suit against Midlothian and Breckenridge in federal court.[16]   That case was dismissed after Pamlab failed to obtain a temporary-restraining order.[17]   Both 'generic' products remain on the market.

---

14. (...continued)
judgment on counterclaim and reply in support of defendants' motion for summary judgment (Doc. No. 82), product analysis report appended to the deposition of Roger Graben.

15. Exhibit 4 to Midlothian's motion for summary judgment on defendants' counterclaim (Doc. No. 61), declaration of Barry D. Leblanc in <u>Metabolite Laboratories, Inc. v. Midlothian Laboratories, LLC</u>, civil action no. 1:03cv2570-WYD (D. Colo.), p. 3.

16. Exhibit 6 to Midlothian's motion for summary judgment on defendants' counterclaim (Doc. No. 61), docket sheet for <u>Metabolite Laboratories, Inc. v. Midlothian Laboratories, LLC</u>, civil action no. 1:03cv2570-WYD (D. Colo.).

17. <u>Id</u>.

On June 14, 2004, Pamlab launched a new version of
Foltx with twice the amount of vitamin B12 (i.e.,
2 mg.).[18]  Pamlab asserts that it developed the new
formulation after studies indicated that additional
vitamin B12 could be superior to other methods in
addressing the nutritional requirements of Pamlab's
targeted patient population.[19]

Meanwhile, Red River Pharma Manufacturing L.L.C., a
company apparently founded in 2003 to develop and
manufacture medical foods, began advertising itself as
the "sole authorized generic licensee for FOLTX."[20]  The
president and CEO of Red River is also the president and
CEO of Pamlab, L.L.C. and Pan American Laboratories,
L.L.C.[21]  Red River claims that its products--Folbalin and

---

18. LeBlanc Declaration, pp. 3-4.

19. Id., p. 3.

20. Exhibit 12 to Midlothian's motion for summary
judgment on defendants' counterclaim (Doc. No. 61),
Folbalin advertisement.  The record does not establish
when these products were first marketed.

21. Exhibit 13 to Midlothian's motion for summary
(continued...)

13

Folbalin Plus, which contain the same active ingredients in the same quantities as original and new Foltx, respectively--are manufactured by the same company with the same formula and specifications as Foltx. In essence, these products are the Foltx manufacturers' own 'generics.'

At the same time that Pamlab launched the new Foltx, it discontinued the original formulation and recalled the remaining stock of original Foltx for exchange with new Foltx.[22] The label of new Foltx indicates the change by stating in red letters "IMPROVED" and "New Strength," and by stating "2 MG CYANOCOBALAMIN [vitamin B12]."[23] Pamlab implemented an 'action plan' for introducing new Foltx that included four mailings of an explanatory letter to approximately 53,000 pharmacists and one mailing of the

---

21. (...continued)
judgment on defendants' counterclaim (Doc. No. 61), deposition of Barry D. LeBlanc, pp. 11-12.

22. LeBlanc declaration, p. 3.

23. Exhibit 9 to Pamlab's motion for summary judgment (Doc. No. 56), new Foltx label.

letter to approximately 57,000 physicians, as well as publishing the letter and other materials in industry media such as Pharmacy Times.[24]

The publicity letter explained the product change in the following terms: "Pamlab, L.L.C. is excited to announce an important improvement to FOLTX®. ... The significant change to FOLTX is based upon 2 significant principles: SAFETY and EFFICACY."[25] The letter also stated: "All new and refill FOLTX prescriptions should be filled with the NEW STRENGTH FOLTX."[26] The parties agree that new Foltx has a different amount of active ingredient than both original Foltx and Midlothian's product. The parties also agree that this change prevents the two products from being interchangeable at pharmacies.

_____

24. Exhibit 4 to Midlothian's motion for summary judgment on count I of its complaint (Doc. No. 58), Foltx 2mg action plan.

25. Exhibit 3 to Midlothian's motion for summary judgment on count I of its complaint (Doc. No. 58), Dear Pharmacist letter.

26. Id.

One month after the introduction of new Foltx, the Eckerd Drugs pharmacy chain ceased purchasing Midlothian's product.[27]  CVS Pharmacy continued purchasing Midlothian's product for approximately nine months after the introduction of new Foltx, and then ceased.[28]

On September 3, 2004, Midlothian filed this lawsuit, and Pamlab later counterclaimed.

### III. MIDLOTHIAN'S LANHAM ACT CLAIMS

The Lanham Act was intended to make "actionable the deceptive and misleading use of marks" and "to protect persons engaged in ... commerce against unfair competition." 15 U.S.C. § 1127.  As originally enacted, § 43(a) of the Act established federal remedies for using "'a false designation of origin' or a 'false description or representation' in connection with any goods or

---

27. Harvey declaration, p. 3.

28. Id.

16

services."  Two Pesos v. Taco Cabana, 505 U.S. 763, 777

(1992) (Stevens, J., concurring in the judgment).[29]

------------------------

29. The version of § 43(a) of the Lanham Act now in
force and applicable to the claims raised in this suit
states, in relevant part:

> "(1) Any person who, on or in connection
> with any goods or services, or any
> container for goods, uses in commerce
> any word, term, name, symbol, or device,
> or any combination thereof, or any false
> designation of origin, false or
> misleading description of fact, or false
> or misleading representation of fact,
> which--
>
>> (A) is likely to cause confusion,
>> or to cause mistake, or to deceive
>> as to the affiliation, connection,
>> or association of such person with
>> another person, or as to the
>> origin, sponsorship, or approval of
>> his or her goods, services, or
>> commercial activities by another
>> person, or
>>
>> (B) in commercial advertising or
>> promotion, misrepresents the
>> nature, characteristics, qualities,
>> or geographic origin of his or her
>> or another person's goods,
>> services, or commercial activities,
>
> shall be liable in a civil action by any
> person who believes that he or she is or
>                              (continued...)

17

Although originally interpreted narrowly, "the 1988 revision of § 43(a) confirmed its application to both misrepresentations of source and other deceptive representations made in connection with the marketing of goods and services." Rest. 3d <u>Unfair Competition</u> § 2 (1995). The statute "now is considered to confer protection against a myriad of deceptive commercial practices." <u>Resource Developers, Inc. v. Statue of Liberty-Ellis Island Foundation, Inc.</u>, 926 F.2d 134, 139 (2d Cir. 1991).

Section 43(a) of the statute encompasses two distinct causes of action. Claims of "product infringement" (trademark or trade-dress infringement) are brought under subsection A of § 43(a)(1) and are subsumed in the more general concept of a false designation of origin or source. In a typical product-infringement case, a plaintiff with rights to a particular mark alleges that

---

29. (...continued)
    is likely to be damaged by such act."

15 U.S.C. § 1125(a).

the defendant adopted the "same or confusingly similar"
mark for its goods or services. <u>SunAmerica Corp. v. Sun
Life Assurance Co.</u>, 77 F.3d 1325, 1334 (11th Cir. 1996)
(citing <u>Conagra, Inc. v. Singleton</u>, 743 F.2d 1508, 1512
(11th Cir. 1984)).  The test for liability for any such
claim is the "likelihood of confusion." <u>Two Pesos</u>, 505
U.S. at 780 ("Whether we call the violation infringement,
unfair competition or false designation of origin, the
test is identical--is there a 'likelihood of
confusion?'") (quoting <u>New West Corp. v. NYM Co. of
California, Inc.</u>, 595 F.2d 1194, 1201 (9th Cir. 1979));
<u>Hyman v. Nationwide Mut. Fire Ins. Co.</u>, 304 F.3d 1179,
1187 (11th Cir. 2002).

Subsection B of § 43(a)(1) prohibits false or
misleading descriptions or representations in the
advertising and promotion of goods and services,
including misrepresentations of the "nature,
characteristics, qualities, or geographic origin" of
goods or services.  15 U.S.C. § 1125(a)(1)(B).  Claims
arising under this subsection are commonly known as

19

"false advertising" claims.  <u>See</u> <u>Resource Developers</u>, 926 F.2d at 139.

The Lanham Act also provides a cause of action for trademark abandonment, pursuant to 15 U.S.C. § 1127.  For ease of analysis, the court will address Midlothian's claims out of order, beginning with the abandonment claim.

### A. Count VI: Abandonment

In count VI of its complaint, Midlothian alleges that Pamlab has abandoned the FOLTX mark because original and reformulated Foltx are too different to be legitimately sold under the same mark.  Midlothian asks that the registration for the mark be cancelled pursuant to 15 U.S.C. § 1119.[30]  According to 15 U.S.C. § 1127, "a mark

_____

30. 15 U.S.C. § 1119 reads, in relevant part: "In any action involving a registered mark the court may determine the right to registration, order the cancelation of registrations, in whole or in part, restore canceled registrations, and otherwise rectify the register with respect to the registrations of any party to the action."  15 U.S.C. § 1064(3) permits the filing of a petition to cancel the registration of an abandoned mark by any person who believes he is or will be damaged
(continued...)

shall be deemed 'abandoned' if either of the following occurs:

> "(1) When its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances....
>
> "(2) When any course of conduct of the owner, including acts of omission as well as commission, causes the mark to become the generic name for the goods or services on or in connection with which it is used or otherwise to lose its significance as a mark...."

Midlothian seemingly desires for the court to analyze Pamlab's conduct as causing the mark "otherwise to lose its significance," since Midlothian alleges neither that the FOLTX mark has been discontinued nor that it has become the generic name for products with the same ingredients.

The question before the court at the summary-judgment stage is whether doubling the amount of active ingredient in Foltx is a change significant enough to create a

---

30. (...continued)
by the registration of the mark.

triable issue of fact as to whether the mark has lost its significance. "The caselaw is uniform that the discontinuity in product that works a forfeiture or abandonment of a trademark is an extreme one." Bambu Sales, Inc. v. Sultana Crackers, Inc., 683 F. Supp. 899, 906 (E.D.N.Y. 1987) (Ross, M.J.) (collecting cases).

Those instances in which a trademark has been deemed abandoned have historically involved changes or substitutions that result in a "wholly different product which is palmed off on the public in place of that upon which the good will has been established...." Mulhens & Kropff v. Ferd Muelhens, Inc., 38 F.2d 287, 295 (S.D.N.Y. 1929) (Mack, Circuit J.) (the assignee of trademark rights to a line of cologne and toiletries enjoyed exclusive rights to the trademark, where the product, though different from the original, is "not wholly inferior"), rev'd in part, 43 F.2d 937 (2d Cir. 1930) (assignee was not protected in its deceptive use of the mark where it did not use an original "secret formula," as advertised).

22

In <u>Pepsico, Inc. v. Grapette Co.</u>, 416 F.2d 285 (8th Cir. 1969), the appellate court invalidated the assignment of a mark long associated with a cola syrup when the assignee applied it to a new and different 'pepper'-type beverage, finding that "any assignment of a trademark and its goodwill ... requires the mark itself be used by the assignee on a product having substantially the same characteristics." 416 F.2d at 288. Similarly, trademark rights have been deemed forfeited when an assignee substituted alum baking powder for phosphate baking powder, <u>Independent Baking Powder Co. v. Boorman</u>, 175 F. 448 (C.C.D.N.J. 1910) (Cross, J.), and when the owner of a trademark for whiskey attempted to include beer under the mark, <u>Atlas Beverage Co. v. Minneapolis Brewing Co.</u>, 113 F.2d 672 (8th Cir. 1940).

By contrast, courts have repeatedly held that some variation in a product sold under a trademark is inevitable, "necessitated by trade discoveries, newer and more economical methods of making the same product, or changed manufacturing conditions...." <u>Mulhens</u>, 38 F.2d

23

at 295.   In <u>E.I. DuPont de Nemours & Co. v. G.C. Murphy Co.</u>, 199 U.S.P.Q. 807 (Trademark Tr. & App. Bd. 1978), the Patent and Trademark Office Trademark Trial and Appeal Board held that a change in the quality of a paint would not interrupt the continuity of the mark, when both products contained "substantially similar chemical ingredients," were the same type of paint (washable, water-base, flat finish), were applied in the same ways, and were distributed through the same trade channels. 199 U.S.P.Q. at 813.   In sum, the mark remains valid so long as "the inherent  and identifiable character of the goods remains the same."   <u>Id</u>.

Likewise, the continuing use of a trademark after assignment has been upheld in cases involving a change in the blend and formula of tobacco, <u>Beech-Nut Packing Co. v. P. Lorillard Co</u>., 299 F. 834, 849 (D.N.J. 1924) (Lynch, J.); a change in the thickness of cigarette paper, <u>Bambu</u>, 683 F. Supp. 899; and a change in the breed of chicken sold under a mark, <u>Hy-Cross Hatchery, Inc. v. Osborne</u>, 303 F.2d 947 (C.C.P.A. 1962).

Here, Pamlab doubled the amount of an active ingredient in its product. This change does not represent an "extreme discontinuity" in the product, Bambu, 683 F. Supp. at 906, either in type or in quality. Increasing the amount of an ingredient cannot be compared to substituting one ingredient for another in the absence of evidence that the amount, rather than the nature, of the ingredient can work a transformative change in the product. No such evidence is before the court. Indeed, the two products marketed as Foltx do not have "substantially similar chemical ingredients," Dupont, 199 U.S.P.Q. at 813; their ingredients are identical.

Midlothian argues that standards for gauging the propriety of trademark continuance for non-pharmaceutical products may not be applicable in this case, because a change in the formulation of a prescription product could result in severe consequences for patients. Midlothian frames this argument with reference to the FDA: "Pamlab has not cited a single example where the FDA allowed a manufacturer to market two prescription products with

different amounts of active ingredients under the same
name."[31]   There is no dispute that the FDCA creates no
private right of action, 21 U.S.C. § 337, and this court
has no authority to determine presumptively whether the
FDA would consider the Foltx product misbranded under 21
U.S.C. § 343.[32]

---

31. Midlothian's opposition to defendants' motion for
summary judgment (Doc. No. 71), p. 12 n.2.

32. In finding that the evidence presented in this
case does not create a triable issue of fact as to
whether the FOLTX mark has been abandoned for purposes of
the Lanham Act, this court does not infringe upon the
FDA's independent and exclusive authority to find that a
medical food has been misbranded, and Midlothian may
petition the FDA to investigate alleged labeling
violations under the FDCA. Sandoz Pharms. Corp. v.
Richardson-Vicks, Inc., 902 F.2d 222, 231 (3d Cir. 1990)
(declining to "usurp administrative agencies'
responsibility for interpreting and enforcing potentially
ambiguous regulations," and suggesting that plaintiff
petition the FDA to investigate alleged labeling
violations that were not actionable under the Lanham
Act). Moreover, Midlothian's own expert refutes the
claim that Pamlab's change could result in severe
consequences for patients: "There is no evidence to
suggest that a multi-vitamin formulation containing 2mg
B12 would present any special risks as compared to a
multi-vitamin formulation containing 1mg B12. Vitamin
B12 has a high margin of safety and no known adverse
effects have been described in this dose range and
(continued...)

Midlothian has not presented evidence that the change wrought by Pamlab's doubling of vitamin B12 renders new Foltx anything less than substantially similar to original Foltx for trademark purposes. Summary judgment is therefore granted in favor of Pamlab on count VI of Midlothian's complaint.

## B. Count I: Improper Use

Count I of Midlothian's complaint asserts a claim of 'improper use' of the FOLTX mark under the Lanham Act. The locution 'improper use' does not appear in the statute or in case law as a distinct cause of action. Midlothian describes the behavior giving rise to this generalized claim as: (1) Pamlab's use of the mark FOLTX to indicate both its original and new product and (2) Pamlab's letter to pharmacists stating: "All new and

_____

32. (...continued)
above."   Exhibit 19 to Pamlab's motion for summary judgment (Doc. No. 56), Expert Report of Ralph Green, M.D., p. 10.

refill FOLTX prescriptions should be filled with the NEW STRENGTH FOLTX."

In its opposition to Pamlab's motion for summary judgment, Midlothian clarifies its claim by asserting that the use of the same mark for both products is a violation of subsection A of § 43(a)(1) of the Lanham Act, whereas the letter to pharmacists constitutes false advertising in violation of subsection B.[33]


## 1. Analysis Under Subsection A

Midlothian alleges that new Foltx represents a substantial change from original Foltx such that the use

---

33. In its own motion for summary judgment on count I of its complaint (Doc. No. 58), Midlothian asks the court to treat both of the behaviors alleged in count I as false advertising. Similarly, while Midlothian reasserts a claim under subsection A in its opposition to Pamlab's motion for summary judgment (Doc. No. 71), it also concludes that "Pamlab's sale of a 2mg. Vitamin B12 product under a mark that symbolizes a 1 mg. product constitutes a false and deceptive trade practice that is actionable under section 43(a)(1)(B) of the Lanham Act." Midlothian's opposition to defendants' motion for summary judgment (Doc. No. 71), p. 9. As will be shown, the court agrees that the alleged behavior should be analyzed as false advertising.

of the mark FOLTX for both products is fraudulent,
creating confusion in violation of subsection A of 15
U.S.C. § 1125(a)(1).  Midlothian correctly notes that,
"[s]ince a trademark is not only a symbol of origin, but
a symbol of a certain type of goods or services and their
level of quality, a substantial change in the nature or
quality of the goods sold under a mark may so change the
nature of the thing symbolized that the mark becomes
fraudulent and/or that the original rights are
abandoned." 3 J. Thomas McCarthy, <u>McCarthy on Trademarks
and Unfair Competition</u> § 17:24 (4th ed. 1996).

It is well settled that a company can be liable under
unfair-competition laws, including the Lanham Act, not
only when it infringes upon the mark of a second company,
but also when it 'passes off' one of its own products for
another of its products.  <u>Royal Baking Powder Co. V.
Federal Trade Commission</u>, 281 F. 744 (2d Cir. 1922)
(holding, in a pre-Lanham Act context, that a
manufacturer of baking powder unlawfully deceived the
public and engaged in an unfair method of competition

when it substituted a key ingredient in its well-known brand of powder to create an inferior powder while continuing to use a similar label). In this context, however, such use of a misleading label is actionable as false advertising. Id.

Here, Midlothian has produced no evidence that Pamlab's use of the mark has created confusion as to the "origin, sponsorship, or approval" of the Foltx product. It is undisputed that both versions of Foltx are produced, marketed and sold by Pamlab, and that the mark is associated with Pamlab alone.[34] By asserting its claim

_____

34. Midlothian's Vice President of Sales testified:

"A. Is there confusion about the source of FOLTX?

"Q. Right.

"A. Not that I know of.

"Q. As far as you know, people still associate FOLTX, whatever formulation, with Pamlab, correct?

"A. I would say yes."

(continued...)

under subsection A of § 43(a)(1) of the Lanham Act, Midlothian essentially asks this court to find that Pamlab has infringed upon Pamlab's own trademark. Instead, the behavior alleged in Midlothian's count I, which involves a company's purported misuse of its own mark, is properly analyzed as false advertising or trademark abandonment.

### 2. Analysis Under Subsection B

The court must therefore determine whether Pamlab has falsely advertised by using the same FOLTX mark for both the original and reformulated product or by sending a letter to pharmacists stating that "All new and refill FOLTX prescriptions should be filled with the NEW STRENGTH FOLTX." To succeed on a false-advertising claim under § 43(a)(1)(B) of the Lanham Act, Midlothian must establish that (1) the advertisements of the opposing

_____

34. (...continued)
Exhibit 10 to Pamlab's motion for summary judgment (Doc. No. 56), Deposition of James D. McEachern, p. 122.

party were false or misleading; (2) the advertisements deceived, or had the capacity to deceive, consumers; (3) the deception had a material effect on purchasing decisions; (4) the misrepresented product or service affects interstate commerce; and (5) the movant has been, or is likely to be, injured as a result of the false advertising. Hickson Corp. v. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc., 299 F.3d 1242, 1247 (11th Cir. 2002)).

### a.  Use of the same mark for original and new Foltx

Midlothian's first false-advertising argument, that original and reformulated FOLTX are too different to be sold under the same mark, is the same argument underlying count VI of Midlothian's complaint discussed above, that Pamlab has abandoned its FOLTX mark such that it should be cancelled pursuant to 15 U.S.C. § 1119.  The legal inquiries relevant to the first false-advertising claim

32

and the abandonment claim overlap but are not coterminous; that is, while certain forms of false advertising could cause a mark to lose its significance, a mark might also lose its significance for the purposes of abandonment even if there has been no false advertising of the goods or services in connection with which the mark is used.  However, if a mark has not been abandoned, then as a logical matter, a company's rightful continuing use of that mark, alone, cannot constitute false advertising, because no deception is involved in that continuing use.

Midlothian's first false-advertising claim is precisely this: that the continuing use of the mark FOLTX, alone, constitutes false advertising.  The court finds that Midlothian has not presented evidence that Pamlab has forfeited or abandoned its FOLTX mark. Therefore, Pamlab's continuing use of the mark for both the original and reformulated versions of the product cannot, alone, constitute false advertising under 43(a)(1) of the Lanham Act, and summary judgment is

granted in favor of Pamlab on this portion of Midlothian's complaint.

### b.  <u>Pamlab's letter to pharmacists</u>

Midlothian also asserts that the letter Pamlab sent to pharmacists stating "All new and refill FOLTX prescriptions should be filled with the NEW STRENGTH FOLTX" constitutes false advertising.  The first <u>Hickson</u> element--the statement must be false or misleading--is satisfied if the challenged statement is literally false, or if it is literally true or ambiguous but "implicitly convey[s] a false impression, [is] misleading in context, or likely to deceive consumers."  <u>Hickson</u>, 357 F.3d at 1261.  If the statement is deemed literally false, "the movant need not present evidence of consumer deception." <u>Vision Care</u>, 299 F.3d at 1247.

Midlothian claims that the statement "all new and refill FOLTX prescriptions should be filled with the NEW STRENGTH FOLTX" is literally false because it instructs pharmacists to fill refill prescriptions with the new

34

product when physicians undoubtedly wrote the original prescriptions with the original Foltx product in mind. Pamlab responds that the statement is a suggestion and therefore incapable of literal truth or falsity. While the statement can hardly be classified as a mere suggestion, given that Pamlab recalled all stock of the original Foltx,[35] the statement does not "misrepresent the nature, characteristics, qualities, or geographic origin" of the product. 15 U.S.C. § 1125(a)(1)(B).

Valid safety concerns may be raised by the total substitution of an existing prescription product by a new version of the product that contains double the amount of an active ingredient. However, the Lanham Act protects the commercial interests of a plaintiff harmed by a competitor's false advertising, and does not permit a plaintiff to act as a "'vicarious avenger' of the public's right to be protected against false advertising." Sandoz Pharms. Corp. v. Richardson-Vicks,

---

35. LeBlanc declaration, p. 3.

<u>Inc</u>., 902 F.2d 222, 230 (3d Cir. 1990) (quoting <u>Am. Home</u>
<u>Prods. Corp. v. Johnson & Johnson</u>, 672 F. Supp. 135, 145
(S.D.N.Y. 1987) (Conner, J.)).

    In other words, while Pamlab's instruction to
pharmacists may raise concerns, it is not misleading
about Foltx as a product, and therefore is not actionable
as false advertising under the Lanham Act.  Moreover, the
very fact that Pamlab recalled the original version of
the product calls into question whether the statement can
be considered misleading in any way, since new Foltx was
the only version of the product available to pharmacists.
Because Pamlab's instruction to pharmacists to fill all
Foltx prescriptions with new Foltx cannot support a claim
of false advertising, Pamlab's summary-judgment motion
should be granted and Midlothian's denied on count I of
Midlothian's complaint, with the result that summary
judgment should be entered in favor of Pamlab on count I.

## C. Count II: False Advertising

Midlothian claims in its second count that two other statements by Pamlab constitute false advertising under 15 U.S.C. § 1125(a)(1)(B): (1) pharmacists violate the law when they dispense Midlothian's product in response to prescriptions written for new Foltx and (2) new Foltx is safer and more effective than original Foltx. Midlothian argues this count in the alternative to count I; that is, the success of Midlothian's first count is dependent on the court finding that new Foltx differs from original Foltx. In count II, Midlothian argues that if the court should find that Pamlab's new product does not differ from the original to an extent that would allow Midlothian to prevail on its first count, then any advertising of new Foltx as "different" must be considered false.

This either-or argument fails to acknowledge that change in a product may be irrelevant for trademark continuity but relevant for product substitution in a pharmaceutical context, such that advertising the product

37

as "different" would not compromise the mark but would also not constitute false advertising.   It is not disputed that new Foltx is not considered the 'generic equivalent' of either original Foltx or the Midlothian product.[36]   While new and original Foltx are different, this fact does not end the inquiry into whether advertisements for new Foltx were false or misleading.

---

36. The president of Midlothian testified:

> "A. ...I've had patients somehow find us, call us up and ask us why they can no longer get our product, the Midlothian product.
>
> ...
>
> The reason they call is because their insurance provider wouldn't pay for it anymore.  They said it's no longer a generic to Foltx.
>
> "Q. Okay.  And was that true?
>
> "A. That was true.
>
> "Q. There was no longer a generic to Foltx, correct?
>
> "A. Not to the new strength Foltx."

Harvey deposition, p. 204.

38

Midlothian alleges that Pamlab made representations to the effect that pharmacists violate the law when they dispense Midlothian's product in response to prescriptions written for new Foltx.  Although this statement may be literally true, Midlothian has presented no evidence that Pamlab actually made this representation.[37]  Midlothian does not respond in any way to Pamlab's motion for summary judgment on this portion of the claim, much less come forward with specific facts showing a genuine issue for trial.  Fed. R. Civ. P. 56(e).  Therefore, summary judgment will be granted on

---

37. With respect to potential generic substitution for original Foltx, Midlothian's president testified:

> "Q. Sir, do you know of any letters that Pamlab has sent to any pharmacists telling them that they would be breaking the law if they dispensed a generic version of original Foltx?
>
> "A. No."

Harvey deposition, p. 283.  No testimony or other evidence before the court indicates that such a statement was made with respect to new Foltx.

count II of Midlothian's complaint to the extent it is based on the allegation that Pamlab told pharmacists they would break the law by dispensing Midlothian's product. See Fitzpatrick, 2 F.3d at 1115-16 ("For issues ... on which the non-movant would bear the burden of proof at trial, ... the moving party [for summary judgment] simply may show[]--that is, point[] out to the district court--that there is an absence of evidence to support the non-moving party's case." (citations and quotation marks omitted)).

The second statement contested in this count is: "Pamlab, L.L.C. is excited to announce an important improvement to FOLTX®. ... The significant change to FOLTX is based upon 2 significant principles: SAFETY and EFFICACY."[38]   Midlothian alleges that this statement advertises new Foltx as safer and more efficacious than original Foltx.

--------------------------------------------------

38. Exhibit 3 to Midlothian's motion for summary judgment on count I of its complaint (Doc. No. 59), Dear Pharmacist letter.

Here, the court does not need to determine whether the statement makes a claim of increased safety and efficacy, nor whether such a statement is false, because Midlothian cannot in any case satisfy the third <u>Hickson</u> element: that the alleged deception had a material effect on purchasing decisions. <u>Hickson</u>, 357 F.3d at 1260. In the Eleventh Circuit, "[a] plaintiff may establish this materiality requirement by proving that 'the defendants misrepresented an inherent quality or characteristic of the product.'" <u>Vision Care</u>, 299 F.3d at 1250 (quoting <u>Nat'l Basketball Ass'n v. Motorola, Inc.</u>, 105 F.3d 841, 855 (2d Cir. 1997). In many circumstances, questions of safety and efficacy are likely to satisfy automatically the materiality prong of the <u>Hickson</u> test. <u>See</u> <u>Performance Indus., Inc. v. Koos, Inc.</u>, 1990 WL 161253 at *5 (E.D. Pa. 1990) (Gawthrop, J.) (granting preliminary injunction and finding that totality of representations regarding "safety, effectiveness, environmental hazard, and the cost" of two de-icing products are material and "likely to influence purchasing decisions"). This must

41

certainly be so in the context of drugs and medical foods, where safety and efficacy are perhaps the primary concerns of consumers.

In this case however, consumers cannot base purchasing decisions on Pamlab's representations of safety and efficacy, whether true or false, for the simple reason that new Foltx is the only version of Pamlab's product on the market, and Midlothian's product is not a market competitor. Midlothian's product, marketed to pharmacists and not to prescribing physicians, depends for its success on pharmacists' ability to substitute it for Foltx. Midlothian does not dispute that its product is no longer substitutable for the new Foltx. Therefore, to the extent consumers of Midlothian's product (drug wholesalers and retailers such as pharmacy chains) have ceased purchasing the product, those purchasing decisions must have been made independently of Pamlab's advertising, because there is no longer any product (original Foltx) for which Midlothian's product may be substituted. This is true no

matter whether Pamlab's advertising of new Foltx is accurate, false, misleading, or nonexistent. Summary judgment should therefore be granted in favor of Pamlab on Midlothian's count II.

### D. Count III: Inducement

Midlothian claims that Pamlab should be held liable for inducing pharmacists to violate § 43(a) of the Lanham Act. Because the court has found no evidence to support claims of primary violations of the Lanham Act, secondary or "contributory" violations must fail as a matter of course. See Societe des Hotels Meridien v. LaSalle Hotel Operating P'ship, L.P., 380 F.3d 126, 133 (2d Cir. 2004) (reversing district court's dismissal of claims of primary violations of the Lanham Act, and reinstating secondary claims asserted under theory of contributory liability).

Even if the court were to find that Midlothian's primary claims survive, summary judgment is due to be granted on the secondary-inducement claim. Societe

involved a claim of trademark infringement against a hotel chain; the secondary 'inducement' claims were asserted against the hotel chain for publicizing its hotels under the disputed trademark in a hotel directory. The hotel directory, therefore, unwittingly advertised the hotels under a disputed mark.  In the instant case, Midlothian claims that pharmacists, in the act of filling a prescription with new Foltx, have impliedly represented to prescription holders that they have resolved any confusion about whether the physician intended new or original Foltx.  Even if this is so, physicians and pharmacists act as the 'consumers' of the products at issue in this case, not prescription holders, and a pharmacist's act of filling a prescription for a prescription holder does not advertise Pamlab's product and cannot sustain a Lanham Act claim of false advertising.

Summary judgment should therefore be granted in favor of Pamlab on Midlothian's count III.

**44**

## IV. MIDLOTHIAN'S ALABAMA
## STATE-LAW CLAIM: COUNT IV

Alabama law does not recognize a common-law tort of 'unfair competition' pleaded in Midlothian's complaint, but this alone will not defeat a claim that alleges facts sufficient to establish a cause of action under the Alabama tort of 'interference with business relations.' L.A. Draper & Son, Inc. v. Wheelabrator-Frye, Inc., 813 F.2d 332, 335 (11th Cir. 1987).

Midlothian never enumerates the specific actions challenged under this count. In defending against Pamlab's summary judgment motion, Midlothian frames its Alabama state-law claim as involving "intentionally false advertising."[39] Alabama's tort of interference proscribes advertising that is "intentionally false and which occupies a causal relationship with the claimed damage." City Ambulance of Alabama, Inc. v. Haynes Ambulance of Alabama, 431 So.2d 537, 540 (Ala. 1983).

---

39. Midlothian's opposition to defendants' motion for summary judgment (Doc. No. 71), p. 22.

45

Pamlab's replacement of original Foltx with a new formulation is not an act of advertising that can be challenged as intentionally false.  Any damages suffered by Midlothian result from this act of replacement, which prevented Midlothian's product from being substituted for Foltx, and not from Pamlab's statements about the new product.  Therefore, irrespective of the truth or falsity of any statements Pamlab made about new Foltx, Pamlab's statements do not bear a causal relationship to Midlothian's claimed damages.  Furthermore, because there is no primary violation of Alabama common law, there is accordingly no secondary 'inducement' violation.  Summary judgment should therefore be granted in favor of Pamlab on count IV of Midlothian's complaint.

## V. PAMLAB'S COUNTERCLAIM

In a counterclaim asserted under § 43(a)(1) of the Lanham Act, 15 U.S.C. § 1125(a)(1), Pamlab alleges that Midlothian's use of the terms 'bioequivalent' and 'generic equivalent' in marketing its product is

46

actionable as false advertising. The reasoning of Pamlab's claim can be summarized as follows: the terms 'generic equivalent' and 'bioequivalent' have specific meanings under the FDCA and in industry practice; any representation of generic equivalence or bioequivalence implies that tests prove such equivalence; Midlothian failed to perform any of the tests that would support such representations when it began marketing its product; it is therefore literally false to call Midlothian's product generically equivalent or bioequivalent to original Foltx; and, if not literally false, the statements are at best misleading because they cause pharmacists to violate state laws governing prescription substitution.

Midlothian has moved for summary judgment on this claim, asserting that Pamlab has no evidence that the industry expects more or different testing than what Midlothian performed. Midlothian also asserts that the FDCA preempts Pamlab's claim to the extent that it is based on Midlothian's failure to perform the tests and

secure the rating that the FDA would require were the products at issue in this case regulated as drugs.

## A. Regulatory Background

The regulatory system governing drug marketing, though not directly applicable to the products at issue in this case, nonetheless forms the backdrop for the parties' arguments about the level of substantiation required for generic substitution of medical foods. The power to regulate drug marketing is vested "jointly and exhaustively" in the FDA and the Federal Trade Commission. Sandoz Pharms. Corp. v. Richardson-Vicks, Inc., 902 F.2d 222, 231 (3d Cir. 1990). Before a new drug may be marketed, the FDA must approve a "new drug application." 21 U.S.C. §§ 331(d) & 335(a). In general, a product similar to an approved drug may be approved and marketed based on an "abbreviated new drug application." Id. § 355(j).

An abbreviated new-drug application "requires the manufacturer of the similar drug to demonstrate that the

48

two drugs are therapeutically equivalent, that is
pharmaceutically equivalent and bioequivalent." <u>Solvay
Pharms., Inc. v. Ethex Corp.</u>, 2004 WL 742033 at *2 (D.
Minn. 2004) (Tunheim, J.); 21 U.S.C. § 355(j)(2)(A)(i)-
(viii).  Two drugs are "pharmaceutically equivalent" if
they share the same active ingredients, strength, and
dosage.  21 C.F.R. § 320.1(c); Food & Drug Admin.,
<u>Approved Drug Products with Therapeutic Equivalence
Evaluations</u> (Orange Book) v-vi (27th ed. 2007), <u>available
at</u> http://www.fda.gov/cder/ob.   Two drugs are
"bioequivalent" if they do not have significantly
different rates and extent of absorption in the body.  21
U.S.C. § 355(j)(8)(B); 21 C.F.R. § 320.1(e); Orange Book,
<u>supra</u>, at vii.

In order to facilitate the appropriate substitution
of generic products for brand products, the FDA publishes
<u>Approved Drug Products with Therapeutic Equivalence
Evaluations</u>, or the Orange Book.  Some States permit drug
substitution only when a purported generic appears in the
Orange Book.  Certain other States require therapeutic

49

equivalence for substitution, but do not require the products to appear in the Orange Book.[40]  As discussed above, the products at issue in this case are medical foods, not drugs.  Foltx (both original and new) and Midlothian's product have been marketed without undergoing any of the FDA-required testing for drugs, and the products do not appear in the Orange Book.

## B. Preemption

While the protections of the Lanham Act overlap to a degree with the exclusive regulatory authority of the FDA, "[c]ourts have come to the general conclusion that

_____

40. In Alabama, for example, state law requires that a generic substitution be therapeutically equivalent, but not necessarily that it appear in the Orange Book: "A licensed pharmacist in this state shall be permitted to select for the brand name drug product prescribed by a licensed physician or other practitioner who is located in this state and authorized by law to write prescriptions, hereinafter referred to as 'practitioner,' a less expensive pharmaceutically and therapeutically equivalent drug product containing the same active ingredient, or ingredients, and of the same dosage form strength, in all cases where the practitioner expressly authorizes such selection...."  1975 Ala. Code § 34-23-8(1).

the FDA's enforcement of the FDCA is primarily concerned with the safety and efficacy of new drugs, while the Lanham Act is focused on the truth or falsity of advertising claims." Solvay, 2004 WL 742033 at *3; see also Sandoz, 902 F.2d at 230.

Courts have held that a false-advertising claim based on a representation of product equivalency--marketing a product as a 'generic' version of a branded product--may be maintained when "the truth or falsity of the statements in question can be resolved through reference to standards other than those of the FDA," but not "where a claim requires interpretation of a matter that is exclusively within the jurisdiction and expertise of the FDA and FDCA...." Solvay, 2004 WL 742033 at *3.

A federal court may not "determine preemptively how a federal administrative agency will interpret and enforce its own regulations." Sandoz, 902 F.2d at 231; Summit Tech., Inc. v. High-Line Med. Instruments Co., 933 F. Supp. 918, 933 (C.D. Cal. 1996) (Collins, J.). Therefore, a plaintiff may not claim, for example, that

51

the mere act of placing a non-FDA-approved product on the market implies FDA approval and thereby constitutes false advertising under the Lanham Act, because to do so would "necessarily intrude on the FDA's exclusive right to grant, deny, or otherwise regulate such approval." Solvay, 2004 WL 742033 at *3 (discussing Mylan Labs., Inc. v. Matkari, 7 F.3d 1130, 1139 (4th Cir. 1993)).

By contrast, an open assertion of FDA approval in advertising a product for which such approval has not been obtained can be proven literally false--either a product has been approved or it has not--and is therefore actionable under the Lanham Act. Mylan, 7 F.3d at 1139 (upholding a trial court's dismissal of a "false-approval" claim for failure to state a claim when plaintiffs did not allege any affirmative representation of FDA approval in defendant's advertising). Similarly, an advertising statement of bioequivalence between two products is actionable under the Lanham Act because such a statement can be proven literally false if, for example, tests supporting such a statement are falsified,

unreliable, or non-existent.   Id. at 1138 (reversing trial court's dismissal of Lanham Act claim for false representation of bioequivalence).

Thus, in Solvay, faced with facts nearly identical to those at issue in the instant case, the district court denied a motion to dismiss the plaintiff's false-advertising claim, finding that the plaintiff could prove under the Lanham Act that the defendant's drug product was not substitutable, and that any advertising of the defendant's drug as 'generic' could therefore be proven literally false.   The claim survived because the plaintiff did not allege that the advertising implied FDA approval or endorsement based on FDA standards, which the FDA alone has authority to define.   Solvay, 2004 WL 742033 at *4.

Here, Pamlab explicitly disavows any suggestion that Midlothian's advertisements falsely imply that Midlothian's product is FDA-approved.[41]   However, at the

41. Pamlab's response in opposition to Midlothian's
(continued...)

same time, Pamlab repeatedly supports its claim by asserting that the Midlothian product "is not listed as therapeutically equivalent to FOLTX" in the Orange Book.[42] This statement is both true and irrelevant: only FDA-approved products appear in the Orange Book; it is undisputed that the products at issue in this case are not subject to FDA-regulated drug-approval processes; and any false-equivalency claim based on the fact that Midlothian's product does not appear in the Orange Book is preempted by the FDA's exclusive authority to approve products pursuant to the FDCA. The simple fact that Midlothian's product does not appear in the Orange Book cannot support a valid claim of false equivalency under the Lanham Act.[43]

---

41. (...continued)
motion for summary judgment on defendants' counterclaim (Doc. No. 76), p. 2.

42. Id., pp. 1-2.

43. Such a finding should not come as a surprise to Pamlab. The court notes that an advertisement for Folbalin, the product produced as an alternative to Foltx by Red River, which shares a president and CEO with
(continued...)

Pamlab also asserts that Midlothian's representation
of generic equivalence, in the absence of therapeutic
equivalence testing, is literally false, and misleads
pharmacists into believing that Midlothian's product is

---

43. (...continued)
Pamlab, states that Red River is the "sole authorized
generic licensee for FOLTX®," while at the same time
explicitly recognizing that the product has not been
tested for therapeutic equivalence by the FDA (and by
extension, cannot appear in the Orange Book).  Folbalin
advertisement, p. 1 (emphasis added).  The advertisement
states that "the FDA has not required that FOLBALIN, nor
other products labeled as containing the same active
ingredients and quantities, be rated for therapeutic
equivalence.  As such, neither FOLBEE nor Midlothian's
product should be considered a generic of FOLBALIN or
FOLTX."  Id.  The advertisement explicitly links
therapeutic equivalence to generic substitutability,
states that Red River's product should not be considered
generic to Midlothian's product and that Midlothian's
product should not be considered generic to Foltx, but
fails to explain how Red River's product may properly be
considered generic to Foltx, since no representation is
made that it has been tested as therapeutically
equivalent.  In essence, it appears from the record that
Red River (which seemingly is nothing more than Pamlab's
own operation to create a generic product to Foltx) is
attempting to market its own product in the regulatory
loophole occupied by medical foods, while at the same
time--and in the same advertisement--attempting to close
that loophole to exclude competitors by suggesting that
their products must be rated therapeutically equivalent
to be considered generic.

therapeutically equivalent to Foltx.   Of course, in framing its claim in this way, Pamlab begs the question of whether therapeutic equivalence, as defined by the FDCA, is the standard by which legitimate generic substitution of medical food products must be judged. Midlothian argues that it is not.

This articulation of the claim makes reference to standards of generic equivalence that only the FDA can define, but it does not require interpretation of those standards.   A plaintiff "may use the FDA regulations listing definitions of bioequivalence, pharmaceutical equivalence, and therapeutic equivalence to establish the appropriate standard by which to judge the literal falsity of [defendant]'s advertisements."   Solvay, 2004 WL 742033 at *4.   See also Grove Fresh Distribs., Inc. v. Flavor Fresh Foods, 720 F. Supp. 714, 716 (N.D. Ill. 1989) (Bua, J.) (nothing prohibits a plaintiff from relying on an FDA regulation "merely to establish the standard or duty which defendants allegedly failed to meet").

56

Pamlab's claim that Midlothian's assertion of bioequivalence is false advertising is not preempted by the FDA because this assertion can be proven literally false. Similarly, Pamlab's claim that Midlothian's assertion of 'generic equivalence' is false advertising is not preempted by the FDA to the extent that Pamlab seeks to prove its claim with evidence that pharmacists understand 'generic equivalence' to imply therapeutic equivalence (or some other standard of equivalence), rather than with evidence that FDA regulations require therapeutic equivalence (a matter that only the FDA can decide).

## C. Merits of the Counterclaim

Pamlab, as counterclaimant, must be able to establish the five Hickson factors in order to prevail on its false advertising claim at trial. That is, Pamlab must show: (1) the challenged statement was false or misleading; (2) the statement deceived, or had the capacity to deceive, consumers; (3) the deception had a material effect on

purchasing decisions; (4) the misrepresented product or service affects interstate commerce; and (5) Pamlab has been, or is likely to be, injured as a result of the false advertising. <u>Hickson</u>, 357 F.3d at 1260. The presence of the fourth element in this case is not disputed by the parties. As noted above, if the challenged statement is deemed literally false, "the movant need not present evidence of consumer deception." <u>Vision Care</u>, 299 F.3d at 1247.

Pamlab does not differentiate in its arguments between the 'bioequivalence' representation and the 'generic equivalence' representation: both statements are offered in support of the idea that Midlothian's advertisement as a whole is false or misleading. Midlothian asserts that the two statements are essentially synonymous in this context and require the same level of substantiation. Pamlab argues that bioequivalence alone does not establish generic equivalence for medical foods, and that, in any case, Midlothian does not have evidence to support either

statement.  The court will analyze each statement separately.

## 1. Bioequivalence

The parties agree that two products are understood to be bioequivalent if they do not have significantly different rates and extent of absorption in the body.  21 U.S.C. § 355(j)(8)(B); 21 C.F.R. § 320.1(e); Orange Book, supra, at vii.  Pamlab's claim is that the assertion of bioequivalence in Midlothian's advertisement is literally false.

### a. Literal truth or falsity

In asserting the literal falsity of Midlothian's bioequivalence statement, Pamlab makes what is known as a 'tests prove' or 'establishment' claim.[44]  Such a claim

---

44. Pamlab states that it "is not arguing that the statements made in Midlothian's challenged advertisements are 'tests show' claims...." Pamlab's response in opposition to Midlothian's motion for summary judgment on defendants' counterclaim (Doc. No. 76), p. 44.  However, (continued...)

may be asserted when a challenged advertisement cites tests or studies on which the representations made by the advertisement rely. To prevail on an establishment claim, a party need only prove that the "tests did not establish the proposition for which they were cited." Vision Care, 299 F.3d at 1248; see also C.B. Fleet Co. v. SmithKline Beecham Consumer Healthcare, L.P., 131 F.3d 430, 435 (4th Cir. 1997); Rhone-Poulenc Rorer Pharms., Inc. v. Marion Merrell Dow, Inc., 93 F.3d 511, 514-15 (8th Cir. 1996); BASF Corp., v. Old World Trading Co., 41 F.3d 1081, 1090 (7th Cir. 1994); Castrol, Inc. v. Quaker State Corp., 977 F.2d 57, 62 (2d Cir. 1992). By contrast, "where the claim is made baldly, with no assertion of test or study validation, its literal falsity may only be proven by proof that the favorable

---

44. (...continued)
elsewhere in the same document, Pamlab states that Midlothian "concedes" the nature of Pamlab's "'tests prove' type claim," id., p. 9, and analyzes Midlothian's advertisement under the 'tests prove' standard.

fact baldly asserted is false." <u>C.B. Fleet Co</u>., 131 F.3d at 435.

The Midlothian advertisement challenged by Pamlab makes no reference to tests or studies. <u>Vision Care</u>, in which the Eleventh Circuit adopted the reasoning of other circuits in applying a different burden of proof to establishment claims than to 'bald' claims, involved an express, rather than implied, reference to tests. Other circuits have accepted that a valid establishment claim may arise from an advertisement that only implies the approval of tests or studies. <u>See, e.g.</u>, <u>C.B. Fleet Co</u>., 131 F.3d at 435 ("When an advertising claim of favorable fact either expressly <u>or impliedly</u> asserts that the fact is testor study-validated, the fact of the validation becomes an integral and critical part of the claim." (emphasis added)).

This court sees no reason why a similar interpretation should not govern the instant case: the parties agree that the term 'bioequivalence' has a specific meaning--both in the FDCA and in industry

61

practice--that implies substantiation.  It follows that if some form of testing does not establish bioequivalence within accepted parameters, then the statement entirely lacks substantiation and may be considered false. Nonetheless, the distinction is irrelevant at this stage of the case because, as shown below, Pamlab has presented evidence both that Midlothian's tests did not establish bioequivalence and that Midlothian's product was not, in fact, bioequivalent, such that a triable issue of fact is created under either standard.

Because Pamlab conflates the 'bioequivalence' and 'generic equivalence' representations, it discusses bioequivalence only as an element of therapeutic equivalence (the "ultimate standard" that Pamlab argues is required for permissible generic substitution in this case).[45] Pamlab refers to the FDA regulations that govern

---

45. "Bioequivalence is a crucial element of the ultimate standard of therapeutic equivalence that underlies public confidence in generic prescription products."   Pamlab's response in opposition to Midlothian's motion for summary judgment on defendants'
(continued...)

bioequivalence,[46] and asserts that Midlothian has no evidence that it conformed to those regulations, including evidence of the _in vivo_ testing "typically required" for a determination of bioequivalence.[47]

Midlothian correctly responds that Pamlab bears the burden of showing that such tests are required for the

----

45. (...continued)
counterclaim (Doc. No. 76), p. 13.

46. 21 C.F.R. § 320.1(e) provides as follows: "Bioequivalence means the absence of a significant difference in the rate and extent to which the active ingredient or active moiety in pharmaceutical equivalents or pharmaceutical alternatives becomes available at the site of drug action when administered at the same molar dose under similar conditions in an appropriately designed study. Where there is an intentional difference in rate (e.g., in certain extended release dosage forms), certain pharmaceutical equivalents or alternatives may be considered bioequivalent if there is no significant difference in the extent to which the active ingredient or moiety from each product becomes available at the site of drug action. This applies only if the difference in the rate at which the active ingredient or moiety becomes available at the site of drug action is intentional and is reflected in the proposed labeling, is not essential to the attainment of effective body drug concentrations on chronic use, and is considered medically insignificant for the drug."

47. Pamlab's response in opposition to Midlothian's motion for summary judgment on defendants' counterclaim (Doc. No. 76), p. 13.

medical foods at issue in this case; simply asserting that Midlothian has falsely advertised because it has not conformed to FDA regulations presupposes without basis that the regulations apply to the product in question, thereby intruding upon the FDA's exclusive jurisdiction. Solvay, 2004 WL 742033 at *3.  The only evidence on the record relating to in vivo testing is contained in the deposition testimony of the CEO of Midlothian's parent company, who apparently does not believe that such testing was required for Midlothian's product.[48]  Pamlab

---

48. The CEO's testimony is as follows:

> "Q. What's your understanding of what it takes to be bioequivalent?

> "A. I believe you have to be within 85 to 125 percent of the--of the innovator's pharmacokinetic profile over the same period of time.

> "Q. And how is that determined?  What kind of test or study would be used to determine that?

> "A. They'd lock patients up or lock subjects up for 24, 48 hours.  They dose them and then they draw blood
> (continued...)

fails entirely to address the fact that the relevant regulations themselves exempt numerous drugs from the type of bioequivalence testing, including <u>in vivo</u> testing, that Pamlab insists is required for Midlothian's unregulated product.[49]

Absent other evidence, Pamlab's failure to establish the testing standards under which the court should judge

---

48. (...continued)
and measure the active--measure the level of the active drug in the bloodstream.

"Q. That's not--I think that's referred to as in vivo testing?

"A. I believe you're correct.

"Q. And there's been no type of in vivo testing as far as you know on the Midlothian product?

"A. No.  It's very expensive."

Exhibit 4 to Pamlab's response in opposition to Midlothian's motion for summary judgment on defendants' counterclaim (Doc. No. 76), Deposition of Carl Whatley, pp. 78-79.

49. 21 C.F.R. § 320.22 is entirely devoted to establishing "criteria for waiver of evidence of in vivo bioavailability or bioequivalence."

an advertising representation of bioequivalence for a medical food would entitle Midlothian to summary judgment on this claim.  However, in moving for summary judgment, Midlothian asserts that "the only evidence in this case is that pharmacists can and do presume that two products are bioequivalent based upon their pharmaceutical equivalence."[50]  In other words, Midlothian itself posits pharmaceutical equivalence as the standard by which its advertising claim of bioequivalence must be judged, and the court must look to see if Pamlab, as the non-moving party, has come forward with evidence to demonstrate why summary judgment would not be proper under this standard. Celotex, 477 U.S. at 323.

Midlothian presents evidence that the manufacturer of its product performed chemical analyses on each batch of product and produced a certificate of analysis indicating

---

50. Midlothian's reply in support of its motion for summary judgment on defendants' counterclaim (Doc. No. 85), p. 5.

the amounts of active ingredients present in each batch.[51]
Midlothian has also shown that, based on those tests, the
manufacturer believed the Midlothian product to be
pharmaceutically equivalent to Foltx,[52] although

---

51. Yeater deposition, p. 98.

52. Yeater testified as follows:

"Q. When Midlothian was developing this
particular product--or when Chemins
was developing this particular
product, do you recall ever being--
there ever being a request from
Midlothian or ProEthic that this
product be pharmaceutically
equivalent to FOLTX?

"A. I don't recall.

"Q. Do you believe that this product is
pharmaceutically equivalent to
FOLTX?

"A. Yes.

"Q. And that's because what?

...

"A. Because I believe they have the
same active ingredients at the same
levels and were manufactured under
the good manufacturing practices."
(continued...)

67

Midlothian apparently never requested confirmation of this fact from the manufacturer until after this litigation was instigated, over 14 months after the product appeared on the market.[53]  Finally, Midlothian presents evidence suggesting that, in this case,

_____

52. (...continued)
Exhibit 1 to Midlothian's reply in support of its motion for summary judgment on defendants' counterclaim (Doc. No. 85), Yeater deposition, pp. 124-25.

53. Yeater testified:

"Q. And that certificate of analysis is going to tell them the results of various tests performed on the end product?

"A. That is correct.

"Q. Prior to the time that you started sending a certificate of analysis with every lot, how did Midlothian know what the results were of the test on the end product?

"A. We did not send that information to Midlothian prior to the creation of the certificates of analysis."

Yeater deposition, pp. 101-02.

68

pharmaceutical equivalence is sufficient to establish

bioequivalence.[54]

_____

54. Exhibit 4 to Midlothian's reply in support of its motion for summary judgment on defendants' counterclaim (Doc. No. 85), deposition of Roger Graben:

> "Q. How about the term bioequivalent? If Midlothian were to market or authorize someone to market on its behalf that its product is bioequivalent to Foltx, is that implying something different than pharmaceutical equivalence?

> "A. We've said earlier that for this product we believe pharmaceutical equivalence to be bioequivalence.

> "Q. Okay.  That's your opinion in this case; correct?

> "A. Correct.

> "Q. So in your opinion, then, there's no difference between a marketing claim that the product is bioequivalent to Foltx to a marketing claim that it's pharmaceutically equivalent to Foltx.?

> "A. To me it's the same term."

Graben deposition, pp. 130-31.

69

However, at least one test of Midlothian's product
revealed the presence of only two of the three active
ingredients found in Foltx.[55]    This evidence alone
indicates that Midlothian at some time marketed a product
that was not pharmaceutically equivalent to Foltx, a
standard that Midlothian itself argues is required for
the representation of bioequivalence made in its
advertisement.[56]    Therefore, the evidence before the

---

55. Exhibit 10 to Exhibit D to Pamlab's unified
supplemental response to Midlothian's motion for summary
judgment on counterclaim and reply in support of
defendants' motion for summary judgment (Doc. No. 82),
product analysis report appended to the deposition of
Roger Graben.  The test did not show the presence of
Vitamin B6, one of the active ingredients in Foltx.
Because Pamlam's unified supplemental response was filed
on the same day as Midlothian's reply in support of its
motion for summary judgment on defendants' counterclaim
(Doc. No. 85), Midlothian has not challenged this test
result.

56. Pamlab also produces evidence that the proportion
of active ingredients to inactive ingredients in
Midlothian's product changed from 7.2 % to 38 % over the
course of its presence on the market, indicating, in the
opinion of Midlothian's own expert, that the formulation
of the product has changed.  Graben deposition, p. 98.
However, Pamlab has presented no evidence that a change
in the proportion of active to inactive ingredients--as
(continued...)

court, when viewed in the light most favorable to Pamlab
as the non-moving party, creates a triable issue of fact
as to whether Midlothian's tests established
pharmaceutical equivalence (the standard for a 'tests
prove' claim), as well as whether Midlothian's product
was in fact pharmaceutically equivalent to Foltx (the
standard for a 'bald' claim of literal falsity).

### b. Materiality

Because Pamlab has presented evidence of literal
falsity of Midlothian's statement of bioequivalence, it
is not required to show actual consumer deception.
However, a complaining party must establish materiality
even when the challenged advertisement is literally
false. Vision Care, 299 F.3d at 1250. "The materiality
requirement is based on the premise that not all

---

56. (...continued)
opposed to, for example, a change in the actual amounts
of active ingredients in the product--has any bearing on
the determination of pharmaceutical equivalence to Foltx.

deceptions affect consumer decisions." Id. Materiality may be established by a misrepresentation of "an inherent quality or characteristic of the product." Id. (citing Nat'l Basketball Ass'n, 105 F.3d at 855). Here, it is precisely the bioequivalence of Midlothian's product to Foltx that would permit consumers (physicians and pharmacists) to prescribe the Midlothian product to patients. In other words, bioequivalence is not only relevant to the consumer decision, but in fact constitutes the only basis for that decision, and materiality is easily established.


### c. Injury

The analysis of injury resulting from false advertising is in many circumstances "more speculative than in an ordinary case where market forces (or independent explanations for a drop in sales) can be analyzed separately from the wrongful conduct." BASF Corp., 41 F.3d at 1094. Factors such as declining prices and increased competition can account for a drop in sales

independent of a Lanham Act violation.  <u>Id</u>; <u>see also</u>
<u>Nikkal Industries, Ltd. v. Salton, Inc</u>., 735 F. Supp.
1227, 1230-32 (S.D.N.Y. 1990) (Tenney, J.) (defendant's
lost sales of ice cream makers not necessarily caused by
plaintiff's advertising in a market characterized by an
increasing number of participants and declining prices);
<u>Schiller & Schmidt, Inc. v. Nordisco Corp</u>., 969 F.2d 410,
415 (7th Cir. 1992) (in a misappropriation of trade
secrets case, plaintiff attempted to attribute all lost
sales to violation, when sales drop was attributable to
personnel changes and entry into market of a powerful,
legitimate competitor).

Midlothian argues that Pamlab cannot prove that the
marketing of Midlothian's product was the actual cause of
any lost profits, because Pamlab cannot show that other
distributors of generic versions of Foltx would not have
captured Midlothian's sales in the absence of
Midlothian's product.[57]  This argument misapprehends both

---

57. Harvey declaration, p. 4.  Midlothian's president
(continued...)

the nature of the evidence on record and the burden under which it must be analyzed at this stage of the proceedings.

Pamlab has submitted expert reports detailing the percentages of Midlothian's sales resulting from prescriptions written directly for Midlothian's product as opposed to sales resulting from prescriptions that were filled with Midlothian's product but written for another product.[58]  Because Foltx was the only competitor

_____

57. (...continued)
testified that, "[I]n my opinion, if Midlothian had not introduced its generic version of Foltx, Pamlab would have lost practically the identical number of sales to generic competitors that it lost with Midlothian in the market.  The purchasers of generic prescription products would have uniformly turned to other versions of generic Foltx, marketed by Breckenridge and Red River, if Midlothian's product was not available."  Id.

58. Exhibits 5 and 8, respectively, to Pamlab's response in opposition to Midlothian's motion for summary judgment on defendants' counterclaim (Doc. No. 76), Reports of Brian C. Reisetter, pp. 21-23 (reviewing prescription data and finding that approximately 80 % of prescriptions filled with the Midlothian product were originally written for another product, presumably Foltx), and Denise T. Dauphin, p. 7.  See also McEachern deposition, p. 90:

(continued...)

marketed directly to prescribing physicians, the report presumes that when Midlothian's product was substituted, it was substituted for Foltx, and calculates the resulting estimated damages to Pamlab.

In other words, unlike many products that compete through advertising for a share of the market, Midlothian's product relied for its sales on the willingness of pharmacists to substitute it directly and transparently for another product--in this case Foltx. The direct substitution of one product for another in the generic-prescription industry can therefore allow for a clearer picture of damages than in other industries where a drop in sales of one product can be linked only circumstantially to the presence of a competing product in the market.

---

58. (...continued)
"Q. So to the extent that the Midlothian product is being dispensed at a pharmacy, your expectation is it's being dispensed as a substitute for FOLTX.

"A. Correct."

It is true that Pamlab's report does not factor into its analysis the possibility that some (or, as Midlothian argues, all) of Pamlab's lost sales would have been captured anyway by other generic competitors. However, this means only that there is a factual dispute regarding the amount of damages for which Midlothian might ultimately be held responsible should its advertisement be proven at trial to have violated the Lanham Act. It does not mean that no injury was sustained. In fact, Midlothian's president concedes that sales of Midlothian's product led directly to losses for Pamlab even as he argues that those losses would have occurred anyway: "Pamlab would have lost practically the identical number of sales to generic competitors that it lost with Midlothian in the market."[59]

Because Pamlab has provided evidence of actual injury, it does not, as the non-moving party, bear an added burden of showing a hypothetical negative: that

---

59. Harvey declaration, p. 4.

76

other generic products would <u>not</u> have captured
Midlothian's sales had Midlothian's product not entered
the market.[60] Midlothian's argument essentially asks this
court to hold that no otherwise-valid false advertising
claim can be sustained when there are more than two
competitors in a market unless the plaintiff overcomes a
presumption that other competitors would have taken its
profits even in the absence of the defendant's
advertising or market presence. This court declines to
so hold.

   The evidence shows that Midlothian's product was
marketed as a substitute to Foltx, and that the product

_____

   60. Midlothian ascribes the (possibly insurmountable)
burden of proving a negative to Pamlab, without any
attempt to produce positive evidence that would support
its motion for summary judgment on damages. For example,
although Midlothian insists that other generic products
would have captured its sales, it does not come forward
with any evidence to support even such a foundational
question as whether the competing generic products were
available in every market occupied by Midlothian's
product. The court cannot simply assume this is the
case, particularly at the summary-judgment stage when all
evidence must be construed in favor of the non-moving
party.

was in fact substituted for Foltx to the detriment of Pamlab's sales. Pamlab has affirmatively set forth specific facts showing a genuine issue for trial on the question of damages. Fed. R. Civ. P. 56(e). Consequently, summary judgment should be denied on Midlothian's bioequivalence representation.

## 2. Generic Equivalence

Pamlab also asserts that Midlothian's representation of generic equivalence is false advertising. Pamlab argues that a representation of generic equivalence here requires the same showing as that required for drugs to receive ratings of therapeutic equivalence in the Orange Book: both pharmaceutical equivalence and bioequivalence.[61]

---

61. The Orange Book gives therapeutic-equivalence ratings to pharmaceutically equivalent products based on whether they can be expected to have the same clinical effect and safety. Exhibit 2 to Pamlab's response in opposition to Midlothian's motion for summary judgment on defendants' counterclaim (Doc. No. 76), Expert report of Richard R. Abood, p. 2. The expert report relied upon by
(continued...)

In the context of over-the-counter drugs, the Third Circuit Court of Appeals has found that, "The law does not presume that consumers assume that all [over-the-counter] drug advertising claims are substantiated. Accordingly, a plaintiff must produce consumer surveys or some surrogate therefor to prove whether consumers expect an advertising claim to be substantiated and whether they expect the level of substantiation to be greater than that which the defendant has performed." Sandoz, 902 F.2d at 229. In support of its claim, Pamlab offers an industry survey indicating that "[p]harmacists do not differentiate the fact that FOLTX is categorized by the FDA as prescription dietary food product rather than a prescription drug."[62]

However, the survey itself does not isolate industry opinions about the standards relevant for the

_____

61. (...continued)
Pamlab states that, "Bioequivalent products are presumed to be therapeutically equivalent." Id.

62. Reisetter report, p. 17. In fact, Foltx is categorized as a "medical food."

substitution of medical foods.  Instead, the survey collects and analyzes opinions about the general category of "prescription products."  Pamlab's expert and author of the survey admits that he has not performed studies to determine how pharmacists evaluate the equivalence of medical foods as opposed to prescription products generally.[63]  From this survey the expert apparently draws

_____

63. Reisetter testified:

> "A. ...my experience is and the research I've done in area is that when people talk about therapeutic equivalence, there [sic] talking about AB rating.  So if they do talk about a food product being therapeutically equivalent, it might be because they assumed that the product is a prescription drug, and therefore assume that the product is a generic equivalent.

> "Q. Have you done any market studies to determine how pharmacists evaluate the equivalence of two medical foods?

> ...

> "A. No. Other than the fact that these products were presented as prescription products.  But no, I
>
> (continued...)

the conclusion that Midlothian's product must be FDA-rated in order to be considered therapeutically equivalent to Foltx.[64]

Indeed, as a result of this conflation of categories,[65] Pamlab suggests repeatedly in its briefs and

---

63. (...continued)
        have not studied specifically that issue."

Exhibit 3 to Pamlab's response in opposition to Midlothian's motion for summary judgment on defendants' counterclaim (Doc. No. 76), deposition of Brian C. Reisetter, pp. 165-66.

64. Reisetter testified:

        "Q. ...I would like to ask you, though, do you have any information to prove that the Midlothian product is not therapeutically equivalent to Pamlab's product?

        ...

        "A. The fact that it's not an Orange Book product means that there isn't clinical evidence that fits the FDA standard that has allows them to call it therapeutically equivalent."

Id., p. 93.

65. It is undisputed that pharmacists are confused or
                                      (continued...)

81

through its expert witnesses that pharmacists expect Midlothian's product to be assigned a rating by the FDA permitting substitution without approval from the prescribing physician.[66]  As discussed at length above,

_____

65. (...continued)
unaware of the category into which the products at issue in this case fall.  The CEO of Midlothian's parent company testified: "I think, probably, you know, 95 % of the physicians and pharmacists out there don't realize [the Midlothian product]'s a nutritional supplement either.  I mean, they don't know what it is."  Whatley deposition, p. 73.  The physicians and pharmacists are not alone.  Whatley himself describes the Midlothian product as a "nutritional supplement," which is a category separate from medical foods under the FDCA.  The term dietary supplement--apparently used synonymously with nutritional supplement--is defined at 21 U.S.C. § 321(ff).

66. For example, Abood writes: "It is therefore my opinion that although a medical food may not be a drug for the purposes of regulation under the FDCA, it is a drug for the purposes of state substitution laws."  Abood report, p. 5.  Reisetter's refers repeatedly to FDA ratings:

> "[Midlothian's    advertisements] constitute a false statement and are misleading to pharmacists because they lead pharmacists to believe that the products are therapeutically equivalent and/or AB-rated, and therefore substitutable without calling the (continued...)

the products at issue in this case are not required to
undergo FDA-approved testing, and any claim that
Midlothian should have obtained FDA approval for its
product or that its advertisements imply such approval is
preempted by the FDCA.[67]

_____

     66. (...continued)
       physician."

Reisetter report, pp. 4-5.

> "A vast majority of pharmacists expect
> the generic products marketed to them to
> be equivalent products as deemed by the
> FDA (e.g. AB-rating). I believe this is
> true regardless of whether the
> prescription product in question is a
> drug or is categorized by the FDA as a
> medical food."

Id., p. 12.

> "In fact, this research identified that
> over 85 % of pharmacists agreed or
> strongly agreed that products being
> substituted for FOLTX without calling
> the physician should be bioequivalent,
> AB-rated, and of the same quality and
> purity of FOLTX."

Id., pp. 18-19.

     67. Reisetter hints at a different sort of claim than
(continued...)

Midlothian asserts that it has evidence of pharmaceutical equivalence, from which bioequivalence may be presumed, meaning that its product can be considered therapeutically equivalent to the extent that determination is required for generic substitution.[68]

---

67. (...continued)
the one made by Pamlab in this litigation when he writes "It would seem intuitive that Midlothian would make its lack of FDA rating or any other important product differences ... clear to pharmacists so that the products could be properly dispensed and administered." Reisetter report, p. 13. Whether a false-advertisement claim based on a company's failure to advertise its product's lack of FDA approval can be sustained under the Lanham Act, or whether it is simply the inverse of the preempted "false approval"-type claim, is a question not before the court.

68. Midlothian's president does not appear to draw any distinction between the various terms at issue in this litigation:

> "Q. So would it be fair to say that your definition of the word 'generic' as it relates to prescription vitamin products, such as B6, B12, folic acid, is synonymous with your understanding of the terms 'pharmaceutically equivalents,' 'bioequivalents,' 'therapeutic equivalents'?
>
> "A. I do feel like in this case they're
> (continued...)

84

68.  (...continued)
         basically all one and the same."

Harvey deposition, p. 35.  By contrast, Midlothian's Vice
President of Sales, apparently forgetting that he had
marketed the Midlothian product as 'bioequivalent,'
testified that his understanding of 'generic equivalent'
meant 'pharmaceutically equivalent,' and that
bioequivalency was <u>not</u> required for generic substitution
of medical foods:

> "Q.  Do you have an understanding of
>      what it means to be therapeutically
>      equivalent?
>
> "A.  No.
>
> "Q.  Do you have an understanding of
>      what it means to be
>      pharmaceutically equivalent?
>
> "A.  My understanding of pharmaceut-
>      ically equivalent and generic
>      equivalent probably are the same.
>
> "Q.  When you stated that bioequivalent
>      does not apply to these dietary
>      supplements, what is the basis for
>      you to say that?
>
> "A.  Because they are not--the drugs
>      we're talking about here today--the
>      drugs.  The dietary supplements
>      we're talking about here today are
>      not drugs."

(continued...)

85

However, as discussed above with respect to Midlothian's representation of bioequivalence, there is evidence suggesting that Midlothian at some time marketed a product that was not, in fact, pharmaceutically equivalent to Foltx.  Therefore, summary judgment is due to be denied on Pamlab's false-advertisement claim relating to the "generic equivalent" statement for the same reasons that it was denied on the "bioequivalent" statement.

**\*\*\*\***

For the reasons given above, summary judgment will be entered in favor of Pamlab on Midlothian's federal and Alabama state-law claims, and summary judgment will be

_____

68.  (...continued)
Exhibit 7 to Pamlab's response in opposition to Midlothian's motion for summary judgment on defendants' counterclaim (Doc. No. 76), Deposition of James D. McEachern, p. 36.

denied on Pamlab's counterclaim.  Pamlab's counterclaim

will go to trial.  An appropriate order will be entered.

DONE, this the 28th day of August, 2007.


                    /s/ Myron H. Thompson
              UNITED STATES DISTRICT JUDGE